UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| DOROTHEA BURTON<br>on behalf of L.V., a minor<br>Plaintiff,<br><br>v.<br><br>CAROLYN COLVIN, Acting<br>Commissioner of Social Security,<br>Defendant. | No. 13 CV 50042<br>Magistrate Judge Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dorothea Burton brings this action under 42 U.S.C. § 405(g), seeking remand of the decision denying her son social security disability benefits based on his attention deficit disorder. For the reasons set forth below, the decision is remanded.

**BACKGROUND**

On July 3, 2006, Dorothea Burton, on behalf of her minor son L.V., filed an application for benefits as a disabled child under Title XVI of the Social Security Act. R. 15. On April 30, 2009, a hearing was held before an administrative law judge ("ALJ"). R. 15. Plaintiff was represented by counsel. L.V. was then 12 years old and in the fifth grade.

At the hearing, Dr. Kathleen O'Brien, a medical expert, testified that L.V.'s attention deficit hyperactivity disorder ("ADHD") did not functionally equal a listing because his symptoms were "variable" depending on whether he was "treatment-compliant." R. 677.

L.V.'s mother testified next. She testified that she lives with L.V. and sees him every day. She started seeking help for him when he was in kindergarten, although he was not formally diagnosed with ADHD until the second or third grade. R. 696. At that time, she was advised to put him on medication, but resisted initially. R. 697 ("Because I wanted him to be a normal

child. I wanted him to be functioning as any other child would be."). She was actively involved in this decision-making process, talking with school administrators every other month and sitting in the classroom with L.V. R. 699. Although she was concerned about side effects of the ADHD medication, she eventually agreed that he should take it. She testified that he started taking it in the second grade. R. 706. Initially, "the first couple of weeks," he was given the medication at home, but then would spit it out on the bus ride to school. When the school figured this out, everyone agreed that the school nurse would give him the medication when he first got to school. R. 703-04. If there was a substitute nurse, L.V. would sometimes "spit the pill out or get rid of the pill," but then the school would call and tell her he did not get the medicine. R. 708.

Still, she continued to worry about the side effects she was observing: "It's like he's on drugs, like a zombie. He's just slow-motion, drags, and he's not himself. He's a totally different child." R. 699. At the same time, she recognized that the medication "helped a lot." R. 700. She took him off the medication in the summers and when he was not in school. She explained:

> To get him – because they say that if he take it all the time it could mess up his kidneys; his urine, the way he goes to the bathroom; and his – taking away his appetite. That's the only way I get [L.V.] to eat, if I take him off the medicine. When [] he's on the medication, he doesn't eat. That's another reason why he's underweight also.

*Id.* She described the ongoing problem of getting L.V. to eat enough:

> I try to give [him] applesauce, and I have snacks around the house, and I try to make sure – once the medicine is calmed down around – about 9:00 or 10:00 at night, that's when [L.V.] wants to eat. And then they gave me another medication to give him to go to sleep. So after I make sure that he eats, I give him the other medication so he can go to sleep.

R. 702-03.[1]

---

[1] The ADHD medicine is Focalin, and the sleep medicine is Clonidine. R. 703, 705.

The mother also testified that L.V. is distractible and "does stuff to get attention" such as screaming. R. 711. She has to watch him when he goes to the store because he will steal things if not on the medication. R. 712. He punches his sister when they get in arguments. R. 714. He was in the fifth grade but his math and reading were at second grade level even though he had individual tutoring. R. 713.

L.V. testified that he took his medication once a day from the nurse and always took it. The ALJ seemed to question this assertion in the following line of questioning:

> Q. Now, have you ever – ever, ever, ever – put the medicine in your mouth, pretend that you take it, and then, like, spit it out later and not take it?
>
> A. No.
>
> Q. No? You always take your medicine?
>
> A. Yes.

R. 717-18. LV testified that the medication "slow[ed] him down" and that he felt that was "a bad thing" because he would forget things like his folder. R. 718.

On May 20, 2009, the ALJ issued his first decision. In finding L.V. did not have any "marked" limitations in the six domains, the ALJ relied heavily on Dr. O'Brien and repeatedly referred to the failure to take his medication and asserted that L.V. was much better when on the medication. R. 35-36; *see also* R. 37 ("most of his academic difficulty is secondary to his lack of sustained compliance with prescribed treatment"). The ALJ also referred several times to the mother's reluctance in giving him medication. *See* R. 37 ("she balked at teachers' recommendations that the claimant receive medical treatment"); *id.* (in the summer "she suspends his treatment with his prescribed medication").

After the decision was issued, plaintiff obtained new counsel who filed a letter to the Appeals Council arguing for a remand because the ALJ failed to consider, among other things,

questionnaires completed by two of L.V.'s teachers in May 2009. Based on this and other arguments, the Appeals Council remanded the case to the ALJ. R. 48-49.

On May 13, 2011, the same ALJ held a second hearing. This hearing was a little over two years after the first one, and L.V. was then in the 7th grade. A new medical expert (Dr. Larry Kravitz) testified that L.V. did not have any marked difficulties in the six domains. Like Dr. O'Brien, Dr. Kravitz noted that L.V. performed better in school while on medication. He found that the domain of interacting and relating to others was the most significant area of impairment because some evidence suggested that L.V.'s "behavior problems were escalating again" after some improvement. R. 619. Dr. Kravitz agreed that the ADHD medication generally has the side effects of loss of appetite and sleep problems, but would not elaborate any further because, he said, "I'm not a psychiatrist." R. 643. Dr. Kravitz was asked about an incident in December 2010 when L.V. stole something from a Wal-Mart: "The interventions have not been [] 100-percent. The mother's testimony is that it continues to be a problem. [] I don't doubt that it would continue to be a problem in the future, as well." R. 653-54. Dr. Kravitz conceded that the mother would not be able to ever let L.V. go to the store by himself but he thought that this was a relatively small thing, stating that "the only consequence, in my opinion, is [] she needs to be with him in the store so he doesn't steal." R. 654. He pointed out that L.V. had been described by some "as a sweet child" and "has a number of friends." *Id.*

The mother testified that L.V. was still receiving special education services in three of his classes and was working with a social worker, a teacher, and a counselor. R. 622. She stated that the medication "slows his thinking" and that L.V. can "stay mostly controlled when he [is] on the medication." R. 622. She testified that she helps LV with his homework every time he brings it home. *Id.* L.V. was kicked out of summer school in 2009 because he stole an item from another

student's book bag. R. 623. He was not then on medication. She explained why she stopped the medication in the summers:

> Because in the summertime I try to take him off the medication so he can grow and – so he can grow and try to get more focused. But that's the only reason why I took him off, because the medication takes his appetite away. And I want him, like, to try to gain his weight and try to grow, because the medication stops his growth, and it don't let him eat – takes his appetite away.

*Id.* She testified that the medication continued to make L.V. nervous and irritated. R. 628. His medication had been adjusted several times to try to lessen these side effects. *Id.*

L.V. testified that he sometimes had trouble understanding things at school. R. 657. His mom and sisters sometimes helped him with homework. R. 659. He denied having any problems focusing on his homework. R. 658. He stated that he has problems with other students at school, "[n]ot getting along, saying things that are rude." R. 659. These problems emerge when he gets teased about his small size. R. 660. He does not like taking the medication because "it makes [him] feel weird." R. 661.

On November 17, 2011, the ALJ issued a second decision, again finding plaintiff not disabled. In this decision, like the first one, the ALJ relied on the medical expert to find that L.V. was not marked in any of the six domains. The ALJ continued to believe that failure to take the medication was the key variable in explaining L.V.'s problems.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v.*

*Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

To determine whether a child under the age of 18 is disabled within the meaning of the Social Security Act, the ALJ applies a three-step evaluation. 20 C.F.R. § 416.924(a). The ALJ must inquire whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"; and (3) the claimant has an impairment or combination of impairments that meets or medically equals or functionally equals a listing. *Id.* To functionally equal a listing, the impairment must cause a "marked" limitation in two domains of functioning or an "extreme" limitation in one of them. 20 C.F.R. § 416.926a(a). The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

In this appeal, plaintiff raises two arguments. The first is that the ALJ failed to consider the two teacher questionnaires from May 2009 showing that L.V. had marked limitations in several of the six domains. The second is that the ALJ improperly discounted L.V.'s mother's testimony. The arguments overlap in that they ultimately both relate back to the ALJ's overarching rationale that L.V. did not consistently take his ADHD medication and that when he began doing so, his symptoms improved to the point that he was not disabled.

This Court will begin by considering the two teacher questionnaires, which were submitted after the first hearing and which the Appeals Council argued required a remand. Because they are central to plaintiff's main argument, the Court will describe them in detail.[2] Both are dated May 8, 2009, and both are a standard form questionnaire. The form asks the teacher to answer a general yes-or- no question about whether the student has "problems" in each of the domains. Then, under each domain, there are specific questions requiring the teacher to circle a number from 1 ("No problem") to 5 ("A very serious problem"). The form contains several places for written comments and a final section asking about medication.

Theresa Kraiss filled out such a questionnaire. Ex. 9F. She identified herself as a special education manager who had known L.V. for three years and saw him from one to one and half hours a day, five days a week. R. 433. She checked "yes" in the box stating that L.V. had problems in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving and manipulating objects, and caring for himself. In her written comments, she stated that L.V. often has to work one-on-one with the classroom

---

[2] Because the Appeals Council initially remanded with clear instructions to the ALJ to properly analyze these documents, the Court's review of these letters is fairly extensive. The Court's review of these letters is in contrast to what appears to be a less exacting review conducted by the ALJ, as evidenced by the following quote from the ALJ: "Without detailing every note, even a random recitation of them does not support the argument of the claimant's representative that the claimant's impairments, in combination, functionally equal the listing." R. 23. As shown in this opinion, a thorough – as opposed to random – review of these detailed letters does, in fact, support the claimant.

teacher because "he can't complete grade level work independently," that he "needs help completing assignments, maintaining organization, and maintaining peer relationships," that his "actions can be excessive and extreme," and that he is "sometimes difficult to understand because he lacks the vocabulary to explain situations appropriately." R. 434, 436-37. In the medication section, she checked "yes" to the question asking whether he regularly takes medication. She noted that while on medication L.V.'s "impulse control improves but he still struggles in all areas." R. 439. She further elaborated:

> The medication isn't effective for the whole school day. It starts to be effective around 9:30 a.m. [L.V.] continues to need a high level of adult support even on medication[.] [L.V.] benefits from the medication but still needs intensive services to function.

*Id.*

Christine Perkovich also filled out a questionnaire. Ex. 10F. Ms. Perkovich was L.V.'s fifth grade teacher and saw him five days a week, from 8:45 to 3:30 pm, during the 2008-09 school year. R. 441. She had known him for five years. She answered "yes" to the general question whether L.V. had problems in the domains of acquiring and using information, attending and completing tasks, interacting and playing with others, and caring for himself. Unlike Ms. Krauss, Ms. Perkovich answered "no" to the question about the domain of moving about and manipulating objects. In her written comments, she stated that LV. is given a number of learning adaptions that include extended time for assignments, modified workload, reading aloud directions, and directions given in close physical proximity. R. 442. She stated that he needs "daily, continuous support" and "redirection" to complete his work, stay on task, and stay organized. R. 443, 446. She answered "yes" to the question whether he was regularly taking his medication. R. 447. She handwrote the following about his medication:

- [L.V.'s] medication for ADHD takes away his appetite. [L.V.] <u>rarely</u> eats lunch. This is an almost daily occurrence. R. 447 (emphasis in original).

- [L.V.'s] medicine for ADHD helps him focus to a 70% degree. Unfortunately it takes away his appetite and he is rarely seen eating lunch. If not reminded verbally on a daily basis, [L.V.] would not voluntarily take his medicine. R. 447.

- Although [L.V.] is clearly helped by the medicine he takes, his focus, self-discipline, and organizational habits still need much improvement and support on a daily basis. I am concerned about his lack of food intake and the impact of this on his focus in the afternoon. In order to succeed in school, [L.V.] needs daily assistance to remain focused, disciplined , and organized. R. 448.

Ms. Perkovich also stated that L.V., who was in the fifth grade, was at second grade level in reading, math, and written language. R. 441.

Turning to the ALJ's opinion, this Court finds that the ALJ failed to adequately consider these two questionnaires. The ALJ acknowledged that the Appeals Council had remanded the case asking him specifically to give "particular attention" to them. R. 23. However, the ALJ only briefly summarized the questionnaires in two short paragraphs but did not include most of the specific details summarized above, nor did he analyze them in any way. *Id.* Rather than addressing the specific observations and conclusions, the ALJ instead discounted the two questionnaires in one fell swoop based on the following reasoning. He concluded that the teachers mistakenly believed that L.V. "was taking his medication as prescribed at home" when he was not due to the mother's "personal preference" in not giving him the medication. R. 25.

The problem with this explanation is that the factual premises are not supported by the record. To start with the questionnaires themselves, the teachers' comments do not suggest that they were in the dark about whether and when L.V. was taking his medication. Ms. Krauss observed that the medication did not take effect until 9:30 in the morning and that it often wore off in the afternoon. Ms. Perkovich observed that he was "70% effective" on the medication, and noted that it caused L.V. to skip lunch on a daily basis. These comments do not reveal any

uncertainty. Both teachers clearly believed that L.V. was on medication most days. It is not surprising that these teachers could offer such fine-grained observations as they knew L.V. well, having observed him for many years in the school as well as throughout the fifth grade school year.

The other witnesses also indicated that L.V. was taking the medication at this time and that he was receiving it from the school nurse, and not taking it "at home" as the ALJ stated in his opinion. L.V.'s mother was consistent in her testimony that, despite her initial reservations about giving L.V. the medication when he was in the second grade, she allowed him to take the medication since that time (except for summers and possibly weekends) and that she believed that he took it consistently because the school would call her if he did not. L.V.'s testimony was even more unequivocal. He testified that he *always* got his medication at school and *never* once spit it out. (As discussed below, the ALJ credited L.V.'s testimony over his mother's.) There is other documentary evidence to show that he had been receiving medication at school since well before the questionnaires were completed. *See, e.g.*, R. 548 (December 18, 2008 note from school nurse: "[L.V.] *currently* takes Focalin XR 15 mg and the medication is taken at school. [L.V.] started taking medication at school in January of 2007.") (emphasis added). The ALJ pointed to no evidence to the contrary. Even if there were days when L.V. did not take the medication, such as when there was a substitute nurse, it is hard to see how this would have fooled the teachers who saw L.V. over the entire school year.

In sum, a remand is warranted so that the ALJ can consider the teacher questionnaires in greater detail, and show that he properly considered those questionnaires.[3] This conclusion is supported by *Hopgood v. Astrue*, 578 F.3d 696, 701 (7th Cir. 2009), a case upon which plaintiff relies heavily. There, the Seventh Circuit reversed and remanded because the ALJ failed to discuss portions of teacher reports that were favorable to the student claimant. *Id.* at 700. The teacher forms were just like the forms here. *Id.* The teachers indicated, just as Ms. Krauss and Ms. Perkovich did here, that the student had "serious or obvious problems" in certain domains as a result of his ADHD. *Id.* The Seventh Circuit found that a remand was required even if the teacher reports did not "conclusively establish marked or extreme limitations" by themselves. *Id.* at 701. *Hopgood* is thus directly on point. The government, in its response brief, made no effort to distinguish this key case, even though plaintiff cited to it multiple times in her opening brief. Dkt. # 16 at pp. 10, 14, 17. If *Hopgood* is distinguishable (and it certainly does not look to be from the Court's perspective), the government has failed to show how it is inapplicable.

On remand, the ALJ should also further consider several related questions about the issue of medication. First, the ALJ should specifically consider whether L.V. had marked limitations in any domain even while on medication. It is true, as the ALJ noted, that L.V. performed better while on the medication. This point is not in dispute. But the mere fact that the medication helped or caused improvement to some degree does not necessarily mean that he was not still marked in a domain. As the two teachers stated in their questionnaires, they both believed that

---

[3] Plaintiff also faults the ALJ for not considering an earlier teacher questionnaire from October 2006 completed by Lisa Haapoja. Ex. 5F. This questionnaire also supports plaintiff's argument for a remand. Because this questionnaire is similar to the two questionnaires analyzed above, this Court has not discussed it in detail in this opinion, but the ALJ should also specifically consider it on remand. It is possible that L.V. was not yet on medication when this questionnaire was completed, but this is a question the ALJ can explore on remand.

L.V. had significant limitations even while on medication. Ms. Krauss opined that L.V. continues to need a "*high level* of adult support even on medication." and Ms. Perkovich concluded that, despite the medication, he still needs "support on a daily basis."

Second, to the extent that the ALJ concludes on remand that medication indeed worked at some point, such that L.V. was not disabled, the ALJ should still evaluate the period before this time. In reading the ALJ's opinion, it is not clear when the ALJ believed the medication began working. The application was filed in July 2006. The government in its response brief takes the position that the medication became effective "beginning in approximately June 2009," which is fortuitously right after the two teacher reports were completed. Dkt. # 28 at p.3. But this Court could not find any evidence in the ALJ's opinion that he made such a clear demarcation about when the medication started working. In any event, as plaintiff persuasively argues, the ALJ "should have differentiated his conclusions by time period." Dkt. # 16 at p.12. It is possible that L.V. was disabled for several years but then eventually, after learning to successfully manage his medication, was no longer disabled.

Third, the ALJ should give greater attention to the issue of side effects. The ALJ seemed to believe that L.V.'s taking the ADHD medication was a simple matter, akin to flipping on a light switch in which the problems were easily solved once and for all. The ALJ also seems to have blamed L.V.'s mother for not consistently giving him the medication, stating that she was making a "personal preference," which carries with it the suggestion that she was doing so arbitrarily. But the record paints a more complex picture with evidence suggesting she was diligently experimenting with ways to balance the benefits of the medication against serious short- and long-term downsides.

It is undisputed that the medication had multiple side effects.  On a day-to-day psychological level, L.V.'s mother testified that L.V. was "a zombie" and "a totally different child."  R. 699.  L.V. testified that it "slow[ed] him down" and that he felt that was "a bad thing."  R. 718.  At the second hearing, two years later, the problems had not gone away.  L.V. again complained that the medication made him feel "weird" and "shake" and stated that he "sometimes [sees] things that's not there." R. 662. These side effects were undoubtedly one reason L.V. would try to spit out the medication. As the Seventh Circuit has repeatedly noted, ALJs should take into account the fact that staying on medication is not an easy task especially where there are serious side effects. *See, e.g.*, *Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015) ("Nor did [the ALJ] note the natural reluctance of a person with psychiatric problems (perhaps of any person) to take powerful pain medications, as they can have serious side effects if not carefully used.").  This fact is even more important to consider when the patient is a child dealing with ADHD.

In addition, L.V. experienced loss of appetite and sleep problems. The mother testified how she tried to manage these problems, having him eat late at night when the ADHD medication wore off and then giving him another medication to get him to sleep. The fact that he rarely ate lunch worried Ms. Perkovich, who also noted that missing lunch hurt his performance in the afternoon. The loss of appetite presented an additional problem because, as the ALJ noted during both hearings, L.V. was small for his size which in turn led to fights when he was picked on. *See* R. 694 (ALJ observing:  "It's, I think, pretty obvious he's a very small child").  In light of these issues, the mother's decision to take him off the medication in the summers (and sometimes on the weekends) does not seem unreasonable. In fact, when she did so, he gained weight. R. 523.  Rather than being a failure of compliance, as the ALJ suggested, the mother's

efforts seem like a reasonable attempt to navigate what appears to be a fine line between over-medication and no medication. The record as a whole suggests that the mother had been diligent throughout this long process, appearing at two hearings, visiting her son in school on a monthly basis, taking him to the public library so he could better focus on his homework, taking him to the police station to scare him after he tried stealing things from the store, even taking psychology classes at Northern Illinois to learn "more about my kids, ADHD and the ODD, and stress." R. 697, 699, 710. The government argues that the ALJ had the right to discount the mother's testimony because she was not an "acceptable medical source" who was "capable of giving medical opinions." Dkt. # 28 at p.12. However, the government cites to no case suggesting that a mother would be deemed unqualified to offer testimony about how medication affected her son's appetite and sleep, especially when the child was 12 years old with a 70 IQ and ADHD. If not the mother, then who else would be in a better position to observe these side effects? As the Social Security regulations note, parents "can be important sources of information because they usually see [the child] every day." 20 C.F.R. § 416.924a(a)(2)(i). A child's sleeping and eating habits are not areas typically thought to be outside the expertise of parents.[4]

Having found that a remand is warranted, this Court will only briefly address plaintiff's second argument, which is that the ALJ failed to make a proper credibility determination of L.V. or his mother. To a certain extent, this argument has already been covered in the discussion regarding side effects. *Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007) (although an ALJ's

---

[4] The mother also mentioned concerns about long-term kidney damage from the ADHD medication. Perhaps this is one side effect that might require medical expertise to properly evaluate, but even then, the mother certainly could raise concerns on behalf of her son about these risks. Neither side has pointed to any independent medical evidence either confirming or rebutting the claim that kidney damage was a possible risk with this medication.

credibility determination is normally given deference, the Seventh Circuit concluded it was not warranted because that determination was "intertwined" with the ALJ's failure to fully consider observations by school officials). As noted above, the ALJ's view of the mother's credibility may have been colored by the ALJ's mistaken belief that L.V. was not regularly taking his medication. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence"); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").

Plaintiff complains that the ALJ failed to explain why he discounted the mother's testimony. This Court agrees. The ALJ stated: "Contrary to the level of cognitive functioning described in school and medical records, the claimant's mother attempted to portray him as grossly impaired." R. 24. The ALJ then briefly summarized her testimony about L.V.'s impairments, homework habits, medication compliance, relations with siblings, and school fights. *Id.* However, the ALJ provided little explanation as to what about this testimony was unbelievable. For example, the ALJ noted that the mother testified that L.V. "requires help in reading, writing, mathematics, and socials skills" and that "she helps him with his homework[,] even taking him to the library to do so." *Id.* It is not clear how this testimony contradicts the teacher questionnaires summarized above. Ms. Perkovich and Ms. Krauss stated that L.V. needed "continuous" redirection and that his reading, writing, and math skills were three grade levels behind. Did the ALJ doubt the mother's claim that she took him to the library or that she saw him engage in aggressive physical behavior with his siblings? The ALJ also claimed that the mother testified that the ADHD medication did not improve her son's attention in school. *Id.*

But the mother never denied this fact. She testified, for example, that the medication "helped a lot" and made L.V. "more focused."[5]

The ALJ also concluded that the mother's testimony "did not mirror" L.V.'s testimony. R. 25. The ALJ stated that L.V. described "infrequent, inappropriate behaviors" while the mother described "pervasive and sustained dysfunction." R. 25. Aside from these general statements, the ALJ did not cite to any specific contradiction. This Court has reviewed the transcript from both the 2009 and 2011 hearings and cannot find any obvious major contradictions between either the mother and L.V. or between the mother and the teachers. They all appear to be in agreement on key points. Dr. Kravitz at the second hearing was asked whether the mother's testimony conflicted with psychiatric evidence, and he testified that it did not. *See* R. 649. Without at least a few specific examples, this Court cannot assess the ALJ's apparent decision to credit L.V.'s testimony over that of his mother. L.V. was a child with serious cognitive problems who testified only briefly. Dr. O'Brien at first hearing questioned whether it was even worth calling him as a witness, telling the ALJ that he was "kind of young to be helpful." R. 716.

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further proceedings.

Date: May 8, 2015    By: _____
                         Iain D. Johnston
                         United States Magistrate Judge

---

[5] The only specific contradiction the ALJ referred to is the assertion that the mother told one of the doctors in a January 2009 office visit that the medication was helping L.V. (*see* Ex. 13F at 1). While this piece of evidence certainly may be considered on remand, the ALJ should weigh it along with all the evidence, including the teacher questionnaires, especially given that the ALJ acknowledged that they were "consistent with" the mother's testimony. R. 25.